The appellant, Mr. Rosenstengel, for the appellee, Mr. Champlin. You may proceed. Thank you, Your Honors. May it please this Court, Mr. Counsel, Mr. Champlin. My name is John Rosenstengel. I, along with Brian McChesney, represent the plaintiff appellants in this case. We respectfully request that this Court reverse the trial court, which granted summary judgment against the plaintiff in this matter. By history, this is, of course, our second time to the appellate court in this case. The first appeal involved the trial court dismissing three complaints for failure to state a cause of action. The last one was done with prejudice. This court, of course, reversed that decision of the trial court and remanded the case back. At that time, the defendants filed a motion for summary judgment, which the trial court granted. We respectfully request that the court reverse that decision for three reasons. First, it was error to strike the affidavit of expert Tim Dunn. Second, it was error to state that there were no facts for the jury to decide in this matter. Third, it was error for the trial court to ignore the warning issue in this case. Why was it error to strike the affidavit? Well, sir, the affidavit, first of all, it was peculiar in the way that the affidavit was stricken. There were two motions pending on the day that this case went for motion. One was a motion to strike the affidavit. The second was a motion for summary judgment. When we were there the first time, the trial court, without discussion, immediately said the motion to strike the affidavit is denied. And we went forward and we did the motion for summary judgment argument. Then, deliberately to the plainness, one month later, we get a decision where the court on its own had revisited this matter and stated that they were all conclusions and struck the entire affidavit. It was error because the affidavit contained facts of which reasonable inferences could be drawn and opinions of the expert witness could be gathered. Did he say that the regulator had failed? I'm sorry? Did he say that the regulator had failed? He stated based on his reasonable inference from those facts that the only way to get that much natural gas into that house would have been for there to be a regulator failure. Yes, sir. He did. And the record will clearly show that. That he stated that in the affidavit? That there could not have been that much natural gas in the house without a regulator failure? Yes, that was his opinion and inference based upon the facts that were contained in both the record as well as in his affidavit. In the defendant's brief, they even say that on page 18 of that brief, Rule 191 requires facts for supporting conclusions by an expert witness. There were many things and facts relied upon by Mr. Dunn in coming to his inferences and opinions. First was his experience in the area of natural gas explosions and fire investigations. That is important because it brings into play several of the things that were listed in his affidavit. Let me ask you again. What did he state in his affidavit as to the facts that supported the conclusion that the regulator failed? There were several, Your Honor, and that's exactly where I'm at right now. First of all, with the gas analysis, which was provided by the defendant's own employee, Jerome Dimmick, it was IP 90, a gas analysis, which showed that there was a concentration of gas of 10% in that house. A natural gas concentration of 10%, which was there when this house exploded. Gas explodes when there's a 5 to 15% mixture of air to gas in a house and there is something that ignites it. That was the first thing. The second thing he relied upon was the gas meter reading for the six days prior to this explosion, which showed 3,800 cubic feet of gas that had flowed into this house in the six days since the meter had been read. That's more than the previous two months combined in terms of the gas flow into the house. He also talked about the air exchange in a house. A house just does not fill up with natural gas and the gas stays there. In every house, there is a natural gas, an air exchange between the outside and the inside. Regardless of how well it's insulated, there is an air exchange. He talked about the air exchange in this situation being a .3. What that means is gas, as it comes into the house, is exchanged with the air outside. Gas and air keep exchanging. To get this much gas in that house at this level at the time of the explosion would require an excess amount of gas being pumped into that house. That's what's important. Those facts are extremely important. The fact that there was 10% gas buildup in this house. The fact that 3,800 cubic feet of gas had flowed into this house in the six previous days. The fact that the regulator itself was 43 years old at the time of this explosion. And the magnitude of the explosion itself. The defendants in this case would have you believe that a natural gas buildup of anywhere in the house of 5 to 15% would allow such an explosion to take place. This house was completely devastated, completely leveled. A gas buildup of 5 to 15% in a bathroom is not going to cause that type of explosion to completely obliterate this house. Who said that? Pardon me? Who said that? I'm bringing that point up, Your Honor, because they try to argue the facts in their brief. What they say is a gas concentration anywhere in the house of 5 to 15% could have caused an explosion. It can cause an explosion, but that's why the pictures are in the record, Your Honor, to show that this house was completely obliterated, which coincides with their own employee's gas analysis showing there was 10% gas throughout the house, which is why the entire house was obliterated in this explosion. Those things create questions of fact for the jury in this case. They try now to back away that gas analysis by saying it could have been anywhere in the house in that concentration and not the entire house. Well, that's just one interpretation of that document, and quite frankly it doesn't make any sense because why would their own employee do an analysis that showed 10% concentration using the entire volume of the house? That clearly creates a question of fact as to that document. He didn't qualify that document. He didn't say it could have been in just the bedroom or just a bathroom. He said in that IP90 gas analysis that there was a 10% concentration of gas in the entire volume of the house. That's critical. And not surprisingly, they're backing away from that now in their brief and in their argument. They're saying it could have been anywhere. Well, the fact that we're talking about that document and what it means clearly shows there's inferences to be drawn by the trier of fact and clearly shows that there are opinions that can be drawn as to how it got there and why it got there. And to say, as they're trying to do, back off that document by saying that it clearly could be anywhere is absolutely incorrect. In addition, Your Honor, they, in their affidavits, take the same facts and come up with different opinions. They have different opinions as to what happened. They have different opinions as to what each of those documents meant. Their expert and their employee, excuse me, Jerome Fehmig, prepared his own affidavit where he talked about such things as this shows that the regulator was working properly on the day of the accident. This shows that this happened on the day of the accident. So in essence... Let me ask you this about Dunn and his affidavit. Am I correct that he stated he arrived at his conclusions through scientific principles and conservative mathematical calculations? Yes, sir. Did he provide those? Did he explicate what those were? No, he did not, Your Honor. He did not go through every formula that he provided. Now, why... I'm troubled by that, especially when, if I understand correctly, there was a motion to strike which addressed that, and yet in the face of that... Though actually there was... He did file an amended affidavit, did he not, at some point? Attaching the documents that they said were not attached before, yes, sir. Okay, so you understand what their concerns are, and one of them were the documents and you turn around and attach them. So now we have 191A complied with and out we go. But if they say, well, this is conclusionary, you need to demonstrate how he reached these conclusions. If he says he reached them through scientific principles and conservative mathematical calculations, why aren't they there? Well, he talked about the air exchange rate. He talked about the amount of gas that was in the house at the time of the explosion. He talked about the amount of gas that came through the meter. And in our part of the brief where we talked about that, there are certain things based on your experience that don't always have to be put into every affidavit. For example, to say that gas or that the water freezes at 32 degrees or at zero degrees Celsius doesn't have to be put in there all the time because it's a principle that comes into play. But when you look at the air exchange that he gave you that rate, when he gave you the amount of gas in the house. Well, counsel, let me be more clear. I'm no engineer. I'm trying to look at this in light of the trial judge initially, though this is the NOVA review apparently. I want to ask you about that as well. Yes. But a phrase I like to use when you're talking about experts and expert testimony and explaining expert testimony is to look upon the trier effect, or in this case the court, or this court, as precocious sixth graders. Take us by the hand and walk us through. How did you reach this conclusion, Mr. Expert? Assume nothing. Lay it all out step by step by step by step, which appears to be what the Supreme Court in Robidoux has said is what 191A requires There is no cross-examination at this stage, so you better have it all there. And in the face of a motion saying it's not, it's still not. Why didn't you amend the affidavit if it's capable of being amended to show these scientific principles and conservative mathematical calculations to do so? It was fairly close in time, Your Honor, to the hearing when we got the motion and we did the amended one with the document. In terms of what was in there, it had the elements of facts which reasonable inferences could be drawn. He talked about the calculation with the amount of gas in the house using their own witness's document. That much gas in this house. He talked about the amount of gas that flowed through the meter which confirmed that amount of gas could get in the house. And they talked about the fact that there are calculations that could be performed. He took those facts and obtained reasonable inferences from those facts. He did not go through and specifically say this is the formula you have to use to get to this particular thing, to this particular amount. He did not do that. However, he did rely on the facts provided by them. The same facts that they used in their affidavits to say that there was nothing wrong with the regulations. They, in essence, did the same thing in their affidavits. They came to conclusions that said it must have been working fine since it tested out fine on September 27, 2007. That's what they did in their affidavits. And the court on its own went back and struck our affidavits, left theirs alone, and took those conclusions. They're arguing their conclusions are right. Well, what did the court say about their affidavits? Nothing. Well, by striking yours, you had nothing left, did you? Pardon me? You had nothing left once the affidavit was struck. You're the plaintiff. They didn't need to have an affidavit to prevail or a countering affidavit to prevail once yours was struck, did they? The facts that are on there. First of all, you take the parts of the affidavit that are not conclusions. If the judge says they're conclusions, you can take the parts of the affidavit that remain. That's what the case law says, too. If you look at that document that shows that there was 10% gas concentration in the house, if you look at how much gas came through, if you look at the magnitude of the explosion, those are facts from which reasonable inferences can still be drawn in terms of deciding whether the regulator malfunctioned. Those are facts from them that show that the regulator malfunctioned. The size of this explosion. This was not just a small explosion, and he addressed that in his affidavit, too. This is a very rare occurrence because this type of collection of natural gas doesn't occur very often. This was a large explosion. They're trying to tell you, based on those same facts, that this could have been anywhere in the house of 5% to 15% concentration and it would have caused the explosion. They're backing off the document that their own person provided, and that creates a question of fact, too. If you look at their affidavit, and now they're backing off what that document means, that creates a question of fact. So absolutely there is a question of fact, even if the affidavit is not allowed to be put in. Absolutely there is. They rely on those same facts and come up with their own conclusions. Well, but you didn't answer my question. They don't need to have an affidavit saying anything. They don't need to have an affidavit at all. Yours has been struck because you're the plaintiff, and in the absence of your affidavit, you can't prove your case, and they can make a motion for summary judgment, which is what happened. But you can use their affidavit to create a question of fact. But if theirs is equally deficient because it's based upon conclusionary stuff, then neither affidavit is adequate. I don't think their affidavit was insufficient. I don't think ours was insufficient. But if you look at their affidavit, and now they say it could have been anywhere in the house, then you, as a trier of fact, can look at the magnitude of the explosion and the amount of gas that was in that house and say that that's not right. The standard of review is de novo, you assert? That is correct, sir. I had a look at a recent federal decision. This is what the Southern Circuit said six months ago. When a district court's decision to grant summary judgment is premised on an evidentiary finding, we use a compliant standard of review. We reviewed the district court's decision that a particular statement is not admissible sur se under an abuse of discretion standard, but we reviewed the district court's grant of summary judgment de novo, considering all the evidence laid most favorable to non-moving parties. Why shouldn't there be, when evidentiary rulings underlie the grant or denial of a motion for summary judgment, the same sort of combined standard of review, bifurcated standard of review here, where we would be deferential to the trial court on its evidentiary findings, but kind of like in a search and seizure context, we would take what the trial court has found and then determine whether or not those findings are what legal conclusions. In looking at the cases that have been decided in this district and other Illinois State cases, I think they considered that and decided it was de novo. I know there was a split there for a period of time, but this district, I believe, has followed the de novo, or the de novo review of that. Is that the good rule? I believe it is, Your Honor, because when you're looking at something like an affidavit, a Rule 191, an abuse of discretion period, abuse of discretion standard, it takes away, really, from this court the right to look at it and say for the next court, perhaps, that no, that was proper, and as a matter of law, we believe that that is not a conclusion, but rather the proper inferences and the proper opinion by an expert witness. At some point, that's what we have to do. We have to have experts that offer opinions and inferences based on those facts that are clearly delineated in that affidavit and in their affidavits. So, yeah, I think that it's a better standard to have it as a matter of law de novo to look at it that way.  that there were no facts in the record to support Plaintiff's theory, I think we've talked about them to a great deal. In fact, the court said there were not any facts, quote, any facts, and we've talked about the amount of gas that their own person says it was in the house that they're trying now to back off of, which in and of itself creates a question effect. You talk about the amount of gas that went into that house in six days, which was more than any two-month period before that, that creates a question effect. They argue the facts mean one thing, we argue the facts mean another thing, which shows that summary judgment is not proper. That's why we're here saying it should be reversed and sent back. Finally, I'll talk about something that the court did not address. There was a warning issue that was not addressed by the court in its order, and the affidavit was not stricken of Gordon Plunkett. Gordon Plunkett is a fact witness. He's also an opinion witness. He delivered odorants to the company in the years before this accident. He gave with them a flyer that's represented in our brief that said you should not use the faint or strong odor to tell people what to do when it comes to natural gas. That's the kind of warning that they have provided in this case, the defendant has. What that did was create a question effect in that warning issue because the court didn't even address that. It's an unrebutted affidavit from an expert and a fact witness, and the court didn't even address it. What did the court say in granting summary judgment? He said we didn't have any facts. That was it? Yeah, he didn't talk about the Gordon Plunkett affidavit at all, nor did they try to strike it. So you allege the negligent warning in your complaint? Yes. In the motion for summary judgment, what did the defendant say about that claim? In terms of the warning? Yes. What did they say in their motion for summary judgment? They said the warning was adequate. That was what they said. Did you furnish this affidavit you made reference to? It's in the record. On the warning issue? Absolutely. Did they address the warning issue by affidavit or otherwise? I believe Mr. Themig talked about the warning issue in his. I believe. But that affidavit contained those statements that I just talked to you about from Gordon Plunkett. They did not follow my instructions on these warnings and he thought that they were inadequate. Now, one last question about all this. The argument or the findings by the trial court striking Dunn's affidavit and entering summary judgment in favor of the defense seems to be based upon the issue about Dunn's affidavit. Was there any reference in the summary judgment order at all to the warnings issue? I don't believe there were. He didn't talk about the warnings issue. Okay. Thank you, counsel. We'll hear from you on rebuttal. Thank you very much. Afternoon, your honors. May it please the court, counsel. As a follow-up to your question, Justice Steinman, the court in its order actually said it was granting summary judgment based upon all the reasons itemized by Illinois Power in its motion. So that encompasses the warning issue and we attacked the warning issue at the trial court level and the review of that issue is going to be de novo anyhow. How did you attack it? What did you say? We said there's no evidence anyone read the warning. You can't have proximate cause unless there's a fact showing that somebody read the warning or lied upon the warning. You mean if there is an otherwise legitimate claim that some entity, some company dealing with a dangerous substance gave an insufficient warning to consumers who were subsequently blown up and killed by that substance, that the plaintiffs failed to state a cause of action because they can't prove that the plaintiffs' decedents ever read the warning? Is that the theory? In this circumstance, because... That's a little bit hard to grasp, counsel. Well, and the court in Kane did address it. And the difference is... Well, just pause right there. Tell me what's wrong with my restatement of what it seems to me to be your position on this warning issue. What's wrong is you can't have proximate cause about the contents of a warning. And that's what we're talking about here. Plunkett in his affidavit says he reviews one pamphlet of animals. He itemizes the pamphlet and he says, just as counsel said a few moments ago, his problem is the differentiation between faint and strong odors. That's the problem with the pamphlet. He doesn't say, I don't think this pamphlet is sufficient because it prevents someone from reading it. Hatlin in his affidavit says he smelled gas prior to this explosion. His mother smelled gas prior to this explosion. His friends smelled gas. They went to look for it. And then he says, we did not feel threatened by any smell and assumed there was nothing to worry about because the smell was faint and not strong. He doesn't say, I assumed there was nothing to worry about because I looked at this warning and they told me there was nothing to worry about. It's pretty interesting though, isn't it, that his reliance upon the faintness or the lack of strength of the odor is consistent with the very warning that was given and which is deemed to be inadequate. If there's something in the newspaper and something in the fine print of a bill and something in a pamphlet, I'm going to have to be able to remember what information was provided to me as a consumer. I'm going to have to be able to remember that, yes, it was actually imparted to me in a particular way in order for me or those around me who were dead to be deemed to have whether relied on it or been aware of it. And then it seeps into your consciousness. I mean, I know that's not what typically we're talking about with warnings, but this is like somebody's a consumer of this product. They've probably been consuming it their whole lives. Do you read your gas bill and the flyers with it? I understand the warnings. Do you read and understand your telephone bill or do you still get one? I have a cell phone, Your Honor, and I don't pay. How about at home? Do you have a landline? No. Well, see, you're too modern for that. Go ahead. At any rate, Your Honor, that's the leap they want this court to make and that's the leap they want the trial court to make. That's why they used the exact warning from Plunkett's affidavit in Patlin's affidavit. But they don't say anyone read it. And if you don't read it, then it cannot be the proximate cause of you staying in the house. Well, what about, doesn't the failure to warn claim involve a failure, a claim that the power company failed to set up an appropriate warning to alert these people to the danger of what to do if they smell gas? That's the allegation. On summary judgment. You can't establish proximate cause unless a person injured by an explosion steps forward and says, I read their warning and relied upon it? Correct. Is that right? That's what the case says. So if they're blown up and killed, then there's immunity for the power company? No, not true, Your Honor. Well, why not? Because they can establish that through other forms. Someone else who says, yeah, I was there when the plane was to cede and said, look at this, I'm supposed to, if it's a faint odor, blah, blah. I mean, who does that? I mean, is that what they're left to? Short of something like that? They can't establish proximate cause? I understand your point, Your Honor, and I respectfully submit that the Cain case controls on the proximate cause. Who decided the Cain case? First District. It's not binding on us, Counsel, so go back and let's talk about whether we should accept that rationale. You need four things to prove their cause of action. A duty, a breach of that duty, proximate cause, and damages. Here, they cannot prove proximate cause. They could take anything from our warning. A plaintiff could file a failure to warn case on any warning and say, well, he could have read it. Maybe it's the warning that caused it. It's complete speculation. That just opens the door for litigation on failure to warn. And that's why they have to have some facts. Why isn't it they failed to read the warning that you didn't give? They can't read it if you don't give it. Correct. Maybe the standard is bold print that says, smell gas, run like hell. And the Cain case recognized that. And if you don't give that warning, the lesser warning that you could give, we don't quibble about whether anybody read it or not, because even reading it wouldn't do them any good. Whether they relied on it or didn't rely on it. And Plunkett's Affidavit doesn't criticize us for not bolding something, our method of communication, anything along those lines. And that's the differentiation here. He's criticizing a particular wording in the warning. And he's saying that that caused this accident. If nobody read it, it couldn't be the proximate cause of them not leaving the house. But I don't even think you get to the warning, and I don't think you even get to this regulator issue, because of the tariff. There's no genuine issue as to any material fact with the regulator allegation or the warning allegation. But the tariff, if you look at the tariff, it says, utilities shall not be liable for injury, including death, caused by fire or explosion, whether the same shall affect or occur in connection with the operations or property of the customer, utility, or any other person. Here, we have the presence of natural gas. Here, we have a fire and explosion, and we have injury and death. Under the terms of the tariff, this case falls within the scope. So if I'm walking by the house when it blows up, and I've never seen a warning, and I don't know anything about it, and I'm not a customer, but I'm any other person, there'd be no liability? Or no exposure? Correct, Your Honor. And this is why. Because, as Adams Court recognized, you treat this tariff as law, as a statute, and you interpret it as a statute. So you look at the plain language, which we just did. It clearly falls within the plain language. Look at the legislative intent. The legislative intent behind these tariffs, as recognized in Adams, is to have regulated rates. And regulated rates are partly dependent upon a rule limiting liability. Just like we limit liability for government entities and municipalities and give them immunity under certain circumstances, so, too, the utility receives immunity under certain circumstances to maintain its regulated rates. Now, the Adams case, the court said there is not. The tariffs did not absolve the gas company from its duty. And that case was different for one reason. In Adams, the gas company argued it didn't have a duty because the tariffs didn't say it had a duty. In other words, the tariffs were the end-all, be-all for the duty. And the common law didn't matter. Well, four members of the Supreme Court actually agreed with that analysis. But the majority said no. Absent express language disavowing a duty, we're not going to grant you immunity. Here, you have that express language. And here, summary judgment is appropriate under the tariff. What did the trial judge say about the tariff? The trial judge did not expressly address the tariff other than saying he agreed with everything in our motion for summary judgment. That was brought up in our motion for summary judgment. If he agreed with your tariff argument, why would he need to strike the affidavit? This court, under review, can affirm the trial court's judgment for any reason, Your Honor. Well, that's an interesting point of law counsel, but it doesn't answer the question I asked. Why didn't he address it specifically? Yes. I can't answer that. I don't know why the trial court didn't express anything in more detail or specifically in its order. As to what he did expressly address is the regulator issue. And the only question only question concerning this regulator is did it malfunction? All these other claims that it was old, custom and standard, negligent inspection, negligent maintenance, all of that is irrelevant if it functioned properly. To what extent and the tariff argument is it necessary for you to show that the injured parties were the customers on the account receiving the service? It says any person, Your Honor. What does it say? What does it say? It says it says shall not be liable for any injury caused by fire or explosion whether in connection with operations of property of a customer, a utility, or any person. And it goes on to say utility shall not be liable for injury including death or damage to persons or property caused by the presence of gas at any location owned or controlled by the customer. So your position is they don't need to be customers? Correct. Under the plain language of the tariff. And Justice Connick's question is if he has bad luck to be walking by when the building glows up it's too bad for him? Unfortunately. Sounds pretty harsh to me. That's that's I mean in the government municipality context people get hurt all the time but the government is immune from suit. And sometimes you have harsh results but the legislative intent is accomplished. Now I want to talk about the actual facts concerning the regulator failure to show that there was no genuine issue of material fact. The first fact, there was no leakage or fire at the meter set or from the regulator vent immediately after the explosion. Now Jerome Thiemig in his experience has stated that if pressure was running through this thing to the extent that they allege, this meter set would be leaking at seams. And it would be on fire. It would be leaking through the secondary relief valve on this regulator. They go on and they actually rely on the ICC report. Well, if you look at what the ICC report says, curiously enough, at appendix 187 he says he was there when they took this meter off the house. And this is what he observed. The flow of gas escaping from the open end of the pipe was barely audible indicating low pressure delivery. They're talking about 30 PSI. That's what you put in your car tire. Barely audible. What about the, and I understand Dunn's affidavit was struck, but I've got a weed eater at home and sometimes it works and sometimes it doesn't. You know, this is more complicated than that, but I think there's the indication in his affidavit or in this record, forgetting about it being stricken, that it can work and not work. And if it's not working for a time, couldn't there be a gas buildup? That's his claim. His claim is there was this transient failure and somehow this explosion fixed it. And transient failure cannot occur? We didn't address that. That's not on the record. To be honest with you, Judge, I don't think I'm qualified to answer that. But what we do know is that it's their burden to prove that they have a good faith basis for their claim and to bring a lawsuit. If your weed eater doesn't work, you have to have a basis to show the court it doesn't work. And here they asked to come test it. And we said, fine, come test it, even though it was subjected to massive insult and heat exposure from this explosion. We said, test it, and hopefully, if you test it and you see it test out appropriately, you'll dismiss us and realize, hey, you know what? Amarin is not responsible for this explosion. And they did test it. And the affidavits of Chris Weichel, who is the engineer from the regulator manufacturer, says there was no transient failure of the subject regulator on the day of the incident. And he in his affidavit, unlike Mr. Dunn's attesting that it went through, he says, these are the facts, the cold hard facts. They asked to x-ray it. We said, fine. X-ray it. X-rays show a normal inside working regulator. There were no defects, no broken parts indicated on the x-ray. They got all the discovery that they wanted. We gave them 1,400 pages of documents. We let them test it. We let them x-ray it. All to clear Amarin's name. It is human nature to both to blame and to seek explanation. Is there a dispute in the record that there was an unnatural and dangerous gas buildup in this home? No, Your Honor. So then, the next step is what could have happened? And I'm assuming that Amarin may have a theory about what happened. If it's of record... Now, we have the meter readings and we know from July 27, 2006 to August 2, 2006, sometime during that period, a leak occurred in that home. And we know so much gas went through there. What Dunn is saying in his affidavit is that that amount of gas could not have gone through there absent a regulator malfunction. What he bases his entire conclusion on is this assumption that there is 10% natural gas throughout this home at the time of the explosion. Well, how does he come up with that? What facts does he have to base that upon? It's a guess. There's no way to know how much gas was in that home at the time of the explosion. Now, they point to IP90 and they say, well, IP90, you know, you admit that there was 10% gas in the home because right down here, Jerome Demick says total house volume times 10% 1972 cubic feet. They say, well, that means there's a fact that there was 1972 cubic feet in the house at the time of the explosion. There's a couple problems with that. First, 191 requires them to rely on personal knowledge in their affidavit. Second, this isn't a fact at all. No more than finding the number 1972 written down on a piece of scratch paper and saying, here's my fact. This is the fact I relied upon. And it's interesting. If you look at Dunn's affidavit, he uses words very carefully and then he makes a jump to get to his conclusion. He says the magnitude of this explosion is consistent with 10%. Consistent with 10%. He doesn't say it's inconsistent with 8%, 9%. We know gas is explosive from 5% to 15%. He goes on to say with the concentration of natural gas in the range of 10%, the magnitude of this explosion is consistent with the concentration of natural gas in the range of 10% inside the house. Well, what range? 5% to 15%? I would say that would be in the 10% range. He jumps. There could not have been 10% concentration. Well, he hasn't even said there's a 10% concentration. So right there, his affidavit has a huge gap in it. The fact is his theory basically assumes that there was so much pressure coming out of this thing that there wasn't time for this air to vent out of the house. And that necessarily assumes that the whole house is filled with 10%. Well, how does he know that? Let's look at what he thinks. What about the strength of the explosion? Or what's left? That's his interest, I take it. Well, and I think the plaintiff's argument is based on his experience, he can say, hey, this was a big explosion, so we have excess pressure, and a regulator failed. I don't think he can do that without an actual fact about this circumstance. You look at the Lawson case that they cited. In the Lawson case, he actually worked on, he actually looked at studies. Now, if there was some study that said, hey, an explosion of this magnitude only occurs if something flies so many feet, and he measured it. Maybe he gets closer. I still don't think that's adequate. But, what's he reliable on? IP90, which we talked about. IP180, which just shows how much gas went through the leak. He doesn't say that that much gas couldn't go through. Let me ask this question, counsel. If you switch sides in this case, and you were confronted with a motion to strike because his complaint, or his affidavit was conclusory, what would you have added? I would have added my analysis, and I would have shown the court how I got this conclusion. I don't think he can. I think it's a baseless conclusion, and that's the whole point. This is like saying in the Murphy case, which the court said the expert's affidavit was sufficient, it's like saying, oh, well, this car accident was caused by a malfunctioning driver's seat, even though, after the fact, the driver's seat is fully intact, there's no deficiencies, there's no evidence of failure, because the accident, the type of accident it was, is consistent with driver's seat failure. And that's what we're talking about here. We're talking about baseless conclusions based upon an assumption, an assumption that there was 10% gas and air in the house, an assumption that it was everywhere throughout the house. I think my time is up. One last question. I wanted to ask about this tariff argument. Plaintiff You see what the plaintiff has to say about it all. What's your take, and what about the Adams case, and how it's supposed to be limited, this tariff argument, and so forth? Well, the Adams majority basically said that there was no express language in the tariff absolving the company of duty. And absent express language, we weren't going to absolve. Isn't that the argument you're making to us? That there is express language. Correct. Well, how do we conclude that, given what Adams said? Adams said there was no express language. Here, there is express language, your honor. What was the different tariff we're talking about? Correct. The tariff there, they said, the tariff didn't speak to it. It wasn't on point. And they said, well, the tariff is what you look for for duty. You don't look for it for the common law.  and then you look to the tariff, and if the tariff is expressing on point, the tariff supersedes the common law. That's what Adams said. Thank you, counsel. Thank you, your honor. Rebuttal? Thank you, your honor. Your honor, they brought the tariff issue up last time we were here, and the court addressed it, and the court sent the case back. So I think that's been addressed previously by this court, but, Justice Tymon, you're correct, and it would be very harsh to Justice Kinect, if you were walking by and the house blew up. Well, it's kind of harsh in this case, too, because Mikey Alpert was spending the night at his grandma's house. He wasn't the customer. He happened to be spending the night at his grandmother's house when he was killed when this house blew up. In terms of the argument regarding warnings that you discussed with Mr. Champlin, the question isn't the exact language, necessarily, of this warning, or of the length of it. It is whether the warning is adequate. And whether a warning is adequate is a question of fact. It's not just the exact wording of the language of the warning. It's how the warning is delivered. It's what means they take to get that warning to the public. And that is a question of fact, to be addressed by the jury in this case. Well, you heard the discussion. Is it your position that what Justice Kinect is talking about is your claim, namely, failure to give a proper warning, as opposed to whether or not the warning actually given was sufficient? Yeah, it's how it was delivered, too. Absolutely. That's critical. You can't bury it in some bill. You can't put it in some newspaper that people may or may not read. There's an education... Did your expert express an opinion that his affidavit is how it should be delivered? RP 1162, which is addressed in Mr. Plunkett's affidavit, talks about how it's to be delivered. And, quite frankly, that RP 1162 had been adopted by the state of Illinois about a month before this accident. That part, I think, is in the affidavit. And RP 1162, in his opinion, he says, this warning did not comply with RP 1162. So that's there as well. I mean, that's a question for the jury. It was not addressed by the court in this case. As you can see, he's been up here the entire time arguing facts and what specific documents meant. And now he says that this gas analysis, this official document, gas analysis, is nothing more than a guess. It's not a fact. It's a guess. I understand why he's trying to back off of that document. I understand why they realized what's going on here, and they're trying to back off of it. And, in fact, in their brief, he made the argument, Mr. Champlin did, that gas could have built up for several days. Well, that's addressed in Mr. Dunn's affidavit as well, that there's an air exchange that takes place. So that amount of gas could not have built up over several days. We're arguing facts. And the fact that we're arguing what this document means, and what that document means, and the inference to be drawn from that shows that summary judgment was not proper. This was the most drastic means of ending a case that you could have. This was a summary judgment granted in favor of a defendant. In this case, on behalf of the three people who were killed, and the one person who was burned and psychologically scarred, we respectfully request  court and remand this case. Thank you very much for your attention, Your Honor.